UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| M.B., | Case No.: 6:19-cv-01150-MK |
| Plaintiff, | OPINION AND ORDER[1] |
| v. | |
| SPRINGFIELD SCHOOL DISTRICT NO. 19, | |
| Defendant. | |

**KASUBHAI, Magistrate Judge:**

Plaintiff, a student ("Student") of Springfield School District 19 ("Defendant" or the

"District"), seeks judicial review of the Final Order issued by an administrative law judge

("ALJ") denying all requested remedies under the Individuals with Disabilities Education Act

("IDEA") and Section 504 of the Rehabilitation Act of 1973 ("Section 504")[2]. Compl., ECF No.

1; Ex. 1, Final Order 1, 89, ECF No. 1-1. For the reasons set forth below, the Court affirms the

ALJ's Final Order.

---

[1] The parties consent to jurisdiction by a U.S. Magistrate Judge. ECF No. 12.
[2] While Plaintiff's due process complaint was also filed under Title II of the Americans with Disabilities Act ("ADA") and several Oregon statutes, the Final Order only addressed Plaintiff's request for remedies under the IDEA and Section 504. Transmittal of Entire Record and Transcript, 207; Compl., Ex. 1, Final Order 1, 89-90, ECF No. 1-1.

**BACKGROUND**

Student enrolled with the District beginning from the 8th grade, for the school years of 2014-2015, 2015-2016, 2016-2017, and 2017-2018. Pl.'s Br. 6, ECF No. 21; Def.'s Br. 1, ECF No. 22; Compl. ¶¶ 18, 25, 33, 43, ECF No. 1; *see* Tr. Vol. I 124:5-8. On May 21, 2015, the District found Student eligible for special education services under the category of Other Health Impaired ("OHI") pursuant to the IDEA. Compl., Ex. 1, Final Order, ¶ 23, ECF No. 1-1 (citing Tr. Vol. I 152:7-153:4, 155:21-156:19; Ex. D20). The District's eligibility team also drafted an Individualized Education Program ("IEP"). *Id.*

On January 10, 2018, Student's parent ("Parent") requested the District to convene an official IEP meeting for the purpose of amending the then current IEP. Ex. D246, 3. On January 29, 2018, Ms. Taubenfeld, school psychologist, prepared an evaluation report, Assessment Summary Form 220B, as a record review in preparation for Student's three-year evaluation. Ex. D261; Ex. D266; *see*, Ex. D292, 2; *see also*, Tr. Vol. IX 1794:8-1795:10. Based on the review, Ms. Taubenfeld believed that Student continued to qualify for special education under the category of OHI. Tr. Vol. VII 1435:16-1438:5; Ex. D292, 2-4; *see also*, Ex. D266, 1. On February 1, 2018 at the planning meeting, Parent elected not to sign off on Student's three-year re-eligibility paperwork. Tr. Vol. VII 1458:16-1459:1.

On May 29, 2018, when the District convened an IEP and evaluation plan meeting, Parent requested an evaluation of Student under the eligibility category of Emotional Disturbance ("ED"). Ex. D341, 1-2; Ex. D343, 2-3. The meeting continued on June 13, 2018. Ex. D341; Compl. Ex. 1, Final Order ¶¶ 178, 182, ECF No. 1-1. At the June 13, 2018 meeting, the District presented a detailed evaluation plan under the eligibility category of ED. Ex. D341, 26-27; Ex. D361, 1-2. Parent indicated that she would withhold her consent to evaluate Student

under the category of ED until September 2018, more than 60 calendar days from the meeting. Ex. D359, 2; Compl., Ex. 1, Final Order ¶ 185, ECF No. 1-1. On September 13, 2018, Parent provided written consent for the ED evaluation the District proposed. Ex. D362.

On October 15, 2018, Parent filed a complaint on behalf of Student requesting a due process hearing, alleging substantive and procedural violations of the IDEA, Section 504 and the Americans with Disabilities Act ("ADA") by the District. Transmittal of Entire Record and Transcript, 224; *see* Compl., Ex. 1, Final Order, 1, ECF No. 1-1.

On November 5, 2018, Student's IEP team met to discuss the results of the ED evaluation and assessment conducted by the District. Compl., Ex. 1 Final Order ¶ 214, ECF No. 1-1. After reviewing the medical documentation and assessment information related to the most recent evaluation of Student, the team determined that Student was eligible for special education under the categories of ED and OHI. *Id.* ¶¶ 215-21. Parent agreed with this determination. *Id.*; Ex. D408. The District issued a Special Education Placement Determination, determining that online tutoring is the least restrictive environment for Student. Ex. D416.

After a due process hearing, the ALJ issued the Final Order on April 26, 2019, denying Parent's request for relief. Compl., Ex. 1, Final Order 89, 90, ECF No. 1-1. Parent appealed to this Court pursuant to 20 U.S.C. § 1415(i)(2).

## STANDARD OF REVIEW

When a court reviews an IDEA action, "the [reviewing] court [] (i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C.A. § 1415(e)(2). "[T]he standard of review in

IDEA actions has been characterized as modified *de novo* review." *Ashland Sch. Dist. v. Parents of Student R.J.*, 585 F. Supp. 2d 1208, 1212 (D. Or. 2008), *aff'd,* 588 F.3d 1004 (9th Cir. 2009).

Courts have held that the language of § 1415(e) confers broad discretion on the district court. *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1471 (9th Cir., 1993); *see, e.g., Kerkam v. McKenzie,* 862 F.2d 884, 887 (D.C.Cir.1988) ("the district court's authority under § 1415(e) to supplement the record below with new evidence, as well as Congress's call for a decision based on the 'preponderance of the evidence,' plainly suggests less deference than is conventional [in the review of agency actions]"); *Town of Burlington v. Department of Educ.,* 736 F.2d 773, 791 (1st Cir.1984) ("Congress intended courts to make bounded, independent decisions—bounded by the administrative record and additional evidence, and independent by virtue of being based on a preponderance of the evidence before the court"), *aff'd sub nom. Sch. Comm. v. Department of Educ.,* 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985).

However, courts should not "substitute their own notions of sound educational policy for those of the school authorities which they review." *Ashland Sch. Dist.*, 585 F. Supp. 2d at 1212. "How *much* deference to give state educational agencies, [] is a matter for the discretion of the courts[.]" *Gregory K. v. Longview Sch. Dist.,* 811 F.2d 1307, 1311 (9th Cir. 1987) (emphasis in original). District courts should "give deference to the state hearing officer's findings, particularly when they are thorough and careful." *Livingston Sch. Dist. Nos. 4 & 1 v. Keenan*, 82 F.3d 912, 915 (9th Cir. 1996). A "hearing officer's findings are 'thorough and careful' when the officer participates in the questioning of witnesses and writes a decision contain[ing] a complete factual background as well as a discrete analysis supporting the ultimate conclusions." *R.B. v. Napa Valley Unified Sch. Dist.*, 496 F.3d 932, 942 (9th Cir. 2007).

**DISCUSSION**

**I. Degree of Deference**

Plaintiff requests that the Court review the Final Order with "minimal deference." Pl.'s Reply 2, ECF No. 23. While judicial review in IDEA cases differs substantially from judicial review of other agency actions, "[t]he fact that § 1415(e) requires that the reviewing court 'receive the records of the [state] administrative proceedings' carries with it the implied requirement that due weight shall be given to these proceedings." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 206, 102 S. Ct. 3034, 3051, 73 L. Ed. 2d 690 (1982); *Jackson*, 4 F.3d at 1471-72. Plaintiff's request does not comport with Congress' intent under the IDEA.

As explained earlier, this Court will exercise its discretion and give deference to the ALJ's findings when they are thorough and careful. *Gregory K.*, 811 F.2d at 1311; *Keenan*, 82 F.3d at 915.

**II. Statute of Limitations**

The IDEA provides that "[a] parent or agency shall request an impartial due process hearing within 2 years of the date the parent or agency knew or should have known about the alleged action that forms the basis of the complaint." 20 U.S.C. § 1415(f)(3)(C). Plaintiff claims that the District failed to appropriately evaluate Student in all four school years. Pl.'s Br. 13, ECF No. 21. Defendant contends that the claims concerning school years of 2014-2015 and 2015-2016 are time barred by the IDEA. Def.'s Br. 4, ECF No. 22.

Plaintiff acknowledges the two-year limitation for "harms." Pl.'s Reply 3, ECF No. 23. Nevertheless, Plaintiff asserts that "this backwards-looking framework has been rejected by the Ninth Circuit ..." *Id.* at 3-4 (citing *Avila v. Spokane Sch. Dist. 81*, 852 F.3d 936, 944-45 (9th Cir.

2017) ("We hold the IDEA's statute of limitations requires courts to apply the discovery rule without limiting redressability to the two-year period that precedes the date when 'the parent or agency knew or should have known about the alleged action that forms the basis of the complaint.'"). Because "documents created during the allowed two years [] rely on [earlier] faulty documents[,]" Plaintiff requests that the Court include the earlier documents in its analysis. *Id.* at 4.

Plaintiff's reading of the *Avila* holding is misguided. Contrary to Plaintiff's suggestion that the *Avila* holding expanded the two-year statute of limitations because of earlier "faulty documents," the Ninth Circuit reviewed the IDEA's "knew or should have known" standard and concluded that "the IDEA's statute of limitations requires courts to apply the discovery rule described in § 1415(f)(3)(C)." *Avila*, 852 F.3d at 941. Rejecting the two-year look-back based on occurrence, the *Avila* court held that a plaintiff's awareness of underlying facts "does not necessarily mean [the plaintiff] 'knew or had reason to know' of the basis of their claims" because some issues "require[ ] specialized expertise a parent cannot be expected to have ...." *Id.* at 942, 944. However, nothing in the *Avila* holding changes the statute of limitations imposed by § 1415(f)(3)(C), which requires Parent to request a due process hearing within two years from the date Parent "knew or should have known" about the alleged action that forms the basis of the complaint.

Plaintiff does not contend that Parent was unaware of the alleged action that forms the basis of the complaint in school years 2014-2015 and 2015-2016. Therefore, Plaintiff's claims based on alleged actions occurring in 2014-2015 and 2015-2016 are time barred.

**III. Review of the Final Order**

    **A. General Background of the IDEA, Section 504 and the ADA**

The IDEA was enacted to ensure all children with certain physical or intellectual disabilities receive a free appropriate public education ("FAPE"). 20 U.S.C. § 1400. The IDEA defines FAPE as special education and related services that: (a) have been provided at public expense, under public supervision and direction, and without charge; (b) meet the standards of the state educational agency; (c) include an appropriate preschool, elementary, or secondary school education in the state involved; and (d) are provided in conformity with the IEP required under § 1414(a)(5) of the IDEA. 20 U.S.C. § 1401(a)(18); *Amanda J. v. Clark Cty. Sch. Dist.,* 267 F3d 877, 890 (9th Cir. 2001). The only relief available under the IDEA is relief for the denial of a FAPE. *Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 752, 755 (2017).

"By contrast, Title II of the ADA and § 504 of the Rehabilitation Act cover people with disabilities of all ages, and do so both inside and outside schools." *Id.* at 756. Title II of the ADA prohibits any "public entity" from discriminating based on disability and Section 504 of the Rehabilitation Act prohibits discrimination based on disability in any "federally funded program or activity." 42 U.S.C. §§ 12131-32; 29 U.S.C. § 764(a). "In short, the IDEA guarantees individually tailored educational services, while Title II and § 504 promise non-discriminatory access to public institutions." *Fry*, 137 S. Ct. at 756. Individuals may seek redress for violations of their rights under any one, or all, of these statutes by bringing suits for injunctive relief or money damages. 42 U.S.C. § 12133; 29 U.S.C. § 794a(a)(2).

Determining whether a school district provided the student with a FAPE is a twofold inquiry: (1) whether the district complied with the procedures set forth in the IDEA; and (2) whether the IEP developed through those procedures was reasonably calculated to enable the

child to receive educational benefits. *Board of Educ. of Hendrick Hudson School District v. Rowley,* 458 US 176 (1982). Further, in order for an IEP to be deemed sufficient to meet the stated goals, it must be appropriately ambitious in light of the child's unique needs and circumstances. *Endrew F. v. Douglas County School District*, 580 U.S. ___, 137 S.Ct. 988, 992, 197 L.Ed.2d 935 (2017).

**B. Issues for Review**

Plaintiff appeals all ten conclusions in the Final Order. Pl.'s Br. 13, ECF No. 21.

1. Conclusion 1: The District evaluated Student in all suspected areas of disability in a timely manner.

Plaintiff asserts that in all four school years, the District failed to evaluate Student under the category of ED despite the District's knowledge that Student experienced mental health deficits. Pl.'s Br. 13-17, ECF No. 21; Pl.'s Reply 5-9, ECF No. 23. As previously discussed, Plaintiff's claims are limited to the 2016-2017 and 2017-2018 school years.

The Ninth Circuit employs the "snapshot" rule to determine the appropriateness of a student's evaluation on the basis of the information reasonably available to the parties at the time of the IEP meeting. *L.J. v. Pittsburg Unified Sch. Dist.*, 850 F.3d 996, 1004 (9th Cir. 2016). That is, courts look to the time of the student's evaluation by the school district. *Id.* Additionally, "[a]n IEP must take into account what was and was not, objectively reasonable when the snapshot was taken." *Id.* (citation omitted). Courts judge the eligibility decision on the basis of whether it took the relevant information into account, not on whether or not it worked. *Id.*

*a. The 2016-2017 School Year: Tenth Grade*

The District issued an IEP Progress Report on April 10, 2017 ("2017 IEP Report") and held an annual IEP meeting on April 26, 2017 ("April 2017 IEP Meeting"). Exs. D127, D129.

At the time of the 2017 IEP Report and the April 2017 IEP Meeting, the District was aware that Student was diagnosed by Dr. Murray in 2014 with Major Depressive Disorder, single episode, moderate severity. Ex. D24; Ex. D26; Tr. Vol. III 601:5-6; *see* Compl., Ex. 1, Final Order ¶¶ 15, 21, ECF No. 1-1. Dr. Murray continued to treat Student and was involved in Student's IEP evaluations and progress till the end of November 2018. Tr. Vol. III 501:12-13; Ex. S115; Tr. Vol. I 152:7-153:4, 152:21-156:19; Ex. D20; Tr. Vol. III 535:2-536:4. The District was also aware that Student had attempted suicide in April 2016. Ex. S46; Tr. Vol. I 89:5-90:6, 173:13-174:4. In the previous year, after finding Student eligible under the category of OHI, the District developed an IEP with both parents' participation. Ex. D65. The 2016 IEP summarizes Student's strengths, both parents' concerns, Student's social, emotional, and behavioral challenges, Student's present levels of developmental and functional performance, and how Student's disability affects his/her involvement and progress in the general curriculum. *Id.* at 3. The 2016 IEP identifies goals for Student including the "Social/Emotional/Behavioral" category. *Id.* at 7. It provides for specially designed instruction ("SDI") in two areas, Social Skills and Study/Organizational Skills. *Id.* at 8.

Parent testified that at the time of the 2016 IEP development, "My highest goal was keeping [Student] alive." Tr. Vol. I 195:2. Parent also testified that she was less concerned about Student's social and emotional behaviors than Student's organizational and study skills. *Id.* at 195:3-18. Parent explained that Student would refuse to turn in assignments until he/she believed they are perfect, and Student would become anxious or stressed about falling behind. *Id.* Parent described that organizational and study skills as "relat[ing] to keeping [Student] alive[.]" *Id.*

A year later, the 2017 IEP Report indicates that Student has made progress towards goals within the "Social/Emotional/Behavioral" category and "[i]t appears that the goal will be met by

the next IEP review." Ex. 127, 1-2; *see* Compl., Ex. 1, Final Order 57-59, ECF No. 1-1. At the April 2017 IEP Meeting, the team noted that Student was doing well academically and had improved in his/her ability to maintain emotional regulation at school. Ex. D129. Student's case manager, Ms. Cobb, testified that Student's 2016-2017 school year "went so well." Tr. Vol. V. 916:15-17. Student was earning more credits than previous years and had improved attendance. *Id.* at 916:18-20. Ms. Cobb "was very pleased with [Student's] academic abilities" and "think[s] [Student] felt successful." *Id.* at 916:20-21. Additionally, Ms. Cobb testified that Student was able to stay focused on tasks, perform check-ins, utilize the established safety plan and communicate how he/she was feeling to staff members in Student's individual study class. *Id.* at 916:22-917:3. Ms. Cobb "felt like it was the best year [Student] [ha]d had, from what everyone was telling [her]." *Id.* at 917:3-5. Ms. Cobb did not recall any significant instances on campus related to Student's depression or anxiety and Student did not attempt suicide during this school year. *Id.* at 915:23-916:14.

Consistent with Ms. Cobb's observation, the 2017 IEP Report states that "[Student's] mother is very happy with how well [Student] has done academically this year with a full schedule" and "[Student] continues to show a lot of improvement in [his/her] organizational and study habits." Ex. D129, 3. Further, "[Student] has improved quite a bit in [his/her] ability to maintain emotional regulation at school." *Id.* The Final Order cites the specifics of Student's improvements enumerated in the 2017 IEP Report. Compl., Ex. 1, Final Order ¶¶ 72-73, ECF No. 1-1 (citing Ex. D129).

As to Student's emotional and social skills, Parent testified that Student frequently experienced difficulties responding to peers and was often met with rejection from same gender peers. Tr. Vol. II 227:22-229:25. Student was also easily manipulated into engaging in negative

behaviors in order to win peer approval. *Id.* These experiences triggered emotional responses from Student including hiding in a secluded place in the school. *Id.* at 230:10-21. Dr. Murray's session notes documented that Student had two suicide attempts in September and October of 2016. Ex. D438, 9, 22.

Subsequently on November 22, 2016, Ms. Cobb circulated an email plan with specific instructions regarding Student and the need to monitor Student's whereabouts. Ex. D93; Tr. Vol. V 912:16-913:25. This safety plan was in place for the entire 2016-2017 school year. Tr. Vol. V 914:1-6. The 2017 IEP Report notes that at Parent's request, goals and services concerning Student's social skills were added to Student's IEP. Ex. D129, 3. The goals were developed by Parent and Dr. Murray before they were provided to the District. Tr. Vol. I 216:12-217:3.

At the April 2017 IEP Meeting, based on the input of Dr. Murray and Mrs. Dayton, a Behavioral Support Specialist who worked with Student outside of school, the team revised Student's safety plan. Exs. D133-D138. Parent signed the 2017 safety plan. Ex. 138. Additionally, the District issued a Special Education Placement Determination. Ex. D143, 3. Taking into consideration that Student's progress made toward the IEP goals while receiving individual or small group instruction, the team determined that regular education classroom with up to 20 percent pull-out to be the most appropriate placement for Student. *Id.* Parent, Student, Mrs. Dayton, and Dr. Murray and other team members participated in making the placement determination. *Id.* at 1.

On May 22, 2017, when Student failed to show up for Ms. Cobb's class, Ms. Cobb immediately called Parent and sent an email to team members designated on Student's safety plan to inquire into Student's whereabouts. Ex. S49. In less than 10 minutes, Student was found to have fallen asleep in another teacher's classroom. *Id.* On June 1, 2017, Dr. Murray authored a

letter outlining some additional strategies that Student and Dr. Murray were working on to develop social skills and improve emotional regulation. Tr. Vol. VI 1221:10-22; Exs. D174, S119. Student's IEP team reviewed the information and collaborated with Parent to incorporate Dr. Murray's suggestions into Student's annual goals and short-term objectives. Exs. D178-D180.

Based on the record, the District took into account all information objectively reasonable at the April 2017 IEP Meeting, including Student's prior challenges, Student's progress towards the goals made in the 2016 IEP, and Parent's concerns. Further, the District incorporated requests and suggestions from Parent and Dr. Murray. Looking to the time of Student's evaluation by the District, this Court finds that the District did not fail to appropriately evaluate Student in the 2016-2017 school year.

b. *The 2017-2018 School Year: Eleventh Grade*

On November 2, 2017, the IEP team met to review Student's IEP goals ("November 2017 IEP Meeting"). Ex. S64. Parent reported that she observed significant improvement in Student's ability to seek out adult support when he/she experiences difficulties with peers or teachers. *Id.* Parent also reported concerns including Student's one attempted suicide. *Id.* In an email to Ms. Dean, the school's Assistant Principal, Parent wrote "We also discussed events leading up to [Student's] attempt to hurt [him/herself] and are working on enabling communication via dynamic, shared documents between parent and internal/external support team[.]" Ex. D233, 1.

On January 10, 2018, Parent emailed the District, requesting an "official" IEP meeting with the express purpose of amending the then current IEP to address certain issues in class. Ex. D246, 3. Parent proposed two new SDI categories: Alternatives to Conflict and Dealing with Feelings/Self-awareness. Ms. Cobb testified that she was concerned about this request for several

reasons. Tr. Vol. V 935:3-936:18; Ex. D246, 3-4. Ms. Cobb testified that she did not observe

Student having the level of difficulty or daily conflict Parent alluded to and that the requested

goals and objectives were appropriate for students with more significant deficits than Student.

Tr. Vol. V 935:3-936:18; Ex. D246, 3-4. Additionally, many of the proposed goals appeared

difficult to implement, track and measure in the school environment. *Id.* As Ms. Cobb testified,

Ms. Fee, a licensed special education teacher, did not notice the level of concerns Parent raised.

Tr. Vol. VI 1135:4-1137:15.

On January 29, 2018, Ms. Taubenfeld prepared an evaluation report in preparation for

Student's three-year re-evaluation. Ex. D261. Ms. Taubenfeld conducted a file review in lieu of a

full re-evaluation because she understood that Parent desired an expedited re-evaluation. *Id.*; Tr.

Vol VII 1435:16-1437:4; Ex. D292, 2-3. In preparing the report, Ms. Taubenfeld obtained an

updated Medical Statement from Dr. Murray, collected input from Student's case managers and

general education teachers, and reviewed Student's educational records and previous evaluations.

*Id.* Ms. Taubenfeld concluded that Student continued to qualify for special education under the

category of OHI. Ex. D292, 3.

On February 1, 2018, the District convened an IEP planning meeting and Parent attended

the meeting. Ex. D263. Teachers and specialists reported Student's present level of performance.

Ex. D263; Tr. Vol. VI 1123:1-10. Student was advocating more for him/herself. Ex. D263. At

times, Student would discard an assignment that was not fully complete or was not up to his/her

standard, rather than turning it in. *Id.* Student appeared to have difficulties with homework

assignments with multiple steps. On review of Student's credit completion, the team noted that

Student was on track to graduate with a regular diploma. Tr. Vol. VI 1124:16-21. The team also

noted that Student demonstrated greater success in eleventh grade than in ninth grade despite

more difficult workload than the previous two years. Tr. Vol. VI 1125:1-9. According to Parent's report, while Student continued to be triggered by social media and seemed desperate for friends' approval, Student "had made progress in this area too." Ex. D263, 1. Parent was very happy with Student's improvement. *Id.* at 2. At this meeting, Parent elected not to sign off on Student's three-year re-eligibility paperwork and indicated that she wanted to review Ms. Taubenfeld's evaluation report with Dr. Murray before signing off. Tr. Vol. VII 1458:16-1459:1. Ms. Taubenfeld sent a copy of her report to Parent the next day. Ex. D267, 2-3.

On February 2, 2018, the District issued an IEP Progress Report ("2018 IEP Report"). Ex. D268. The 2018 IEP Report indicated that Student made progress towards the goals in the Social/Emotional/Behavior category. *Id.* It appeared that the goals would be met by the next IEP review. *Id.*

On February 5, 2018, Parent requested an "independent comprehensive evaluation with recommendation for IEP interventions." Ex. D267, 2. Ms. Dean responded:

> You are more than welcome to do your own independent comprehensive evaluation for [Student]. This is typically done when a parent has concerns with the school's evaluation where there are questions about the overall diagnosis. If your concerns are about diagnosis we rely on the physician's statement provided to us (as we are not doctors).
>
> In the meantime, how do you feel about moving forward with the current eligibility until you have the evaluation done? Once you complete the evaluation we can make any changes needed.

Ex. D271, 1. Parent responded that she would research the Independent Educational Evaluation ("IEE") and the team could decide what to do at the next meeting. Ex. D267, 1.

In March 2018, following Parent's email to Ms. Cobb asking whether Ms. Cobb received a request for an IEE, Ms. Dean and Parent had multiple email exchanges. Ex. D283. Parent stated that she wanted an independent evaluation of Student. *Id.* Ms. Dean explained:

From our conversations you wanted support in test serving [Student]. The IEP team is working through that process right now and [Student] is making growth as discussed in the past 2 meetings. Typically an evaluation is conducted once growth is not being made or the parent disagrees with the eligibility/ accommodations/ findings of the IEP team. Since I joined the team you been [sic] a part of every decision and led many of the findings included in the IEP. Is there a particular piece of the IEP or eligibility you disagree with? If so, the district should have the opportunity to conduct its own evaluation or corrective action prior to you seeking an independent evaluation. Please let us know what specific information you would like, and we will move forward with collecting that information with our staff members.

*Id.* at 2.

Parent responded that her "biggest concern is that [Student] has made no progress in terms of social behavior." *Id.* at 1. Ms. Dean responded:

At the last two IEP meetings we discussed progress in terms in [sic] social behavior with peers* * * *. This progress has been demonstrated through completion of an athletic season (peer conflicts caused [him/her] to quit in the past), sleep over at a friend's house (something that had not previously occurred), and [Student] staying on campus a couple of times for lunch to name a few. It should also be noted that [Student] is on track to graduate which means the IEP and accommodations meeting [his/her] needs (although the team is on board to make any needed adjustments for [his/her] Sr year).

As far as the independent evaluation, which pieces of the evaluation do you disagree with[?] I believe we are on the same page in terms of identification (Other Health Impairment and we can add ADD under the OHI eligibility). All accommodations and services were agreed upon last year and met. So in terms of an evaluation, I need to understand what you disagree with in order to proceed. Depending upon your concerns, the district-based team can complete any evaluations you want (if there is not a current evaluation).

*Id.*

After a few more email exchanges, Parent responded that she believed that Ms. Taubenfeld's Form 220B evaluation report was inadequate and that Ms. Taubenfeld ignored Dr. Murray's recommendations. Ex. D286, 1-2. Ms. Dean passed on this information and Parent's request for an IEE to the IEP team. *Id.* at 1.

On April 2, 2018, Parent and Ms. Dean exchanged emails attempting to set up a meeting to discuss an IEE for Student. Ex. D291, 3-4. Ultimately, because of Parent's schedule, Parent asked to forego the meeting and agreed to provide any data the District needed. *Id.* On April 10, 2018, Parent clarified what she wanted to obtain from the IEE:

> The most concerning is the safety factor because of suicidal tendency and social issues.
>
> A 2nd concern is that [he/she] may be on the autism spectrum given some of the symptoms.
>
> 3rd concern is ADHD and how this is currently affecting [his/her] education.
>
> 4th is [his/her] inability to turn and [his/her] work. Either not complete or [he/she] wants to spend more time to make it perfect. [His/her] grades are low yet [he/she] scores high on tests, not clear on what is going on here.

Ex. D291, 1.

On May 4 and May 10, 2018, Parent notified the District of Dr. Murray's recent advice to place Student in a residential placement for Student. Ex. S21, 1; Ex. D321. Dr. Murray recommended high levels of supervision to ensure Student's safety at home, in school and in the community. Ex. D321. In response to this information, the District assigned a one-on-one education assistant to accompany Student at all times while on campus. Tr. Vol. III 2-15; Ex. D439, 72. According to Dr. Murray's treatment summary of May 21, 2018, Student had several past suicide attempts and conveyed a current suicidal ideation in 2016. Ex. D260. Dr. Murray acknowledged that Student has had periods lasting months when he/she met certain goals and had not threatened to engage in self-harm or experienced suicidal ideations. *Id.* at 3-4. However, Student was experiencing suicidal thoughts several times per week at the time of the treatment summary. *Id.* Dr. Murray reported similar progress and regression in Student's ability to manage

his/her emotions, set safe and appropriate boundaries with others, and increase his/her self-esteem. *Id.*

On May 29, 2018, the District convened an IEP and evaluation plan meeting ("May 2018 IEP Meeting") to develop an IEP that would serve Student through the 2018-2019 school year. Ex. D343. At this meeting, Parent and her counsel presented an extensive list of safety concerns for Student, which were surprising to District staff because these concerns did not mirror what the staff observed in the school setting. Tr. Vol. VI 1135:4-22; Ex. D343, 1-3. Parent requested that Student be evaluated under the eligibility category of ED. Ex. D343, 2-3. The meeting was continued on June 13, 2018 ("June 2018 IEP Meeting"). At the June 2018 IEP Meeting, the District presented a detailed evaluation plan identifying numerous assessment tools to be used in evaluating Student under the eligibility category of ED. Ex. D341, 26-27, Ex. D361, 1-2. However, Parent indicated that she preferred to have Student evaluated by Educational Connections. Tr. Vol. III at 303:18-305:2. Parent decided to withhold consent for the requested evaluation until September 2018. Ex. D359, 2.

On June 22, 2018, Dr. Megert responded to Parent's request for an evaluation by Educational Connections: "While the district does not plan on offering payment and/or arrangement for an evaluation conducted by an outside entity a suggested by the parent, the district is fully prepared to conduct an evaluation to consider the special education eligibility of Emotional Disturbance (ED)." Ex. D366, 2-3.

Parent gave consent for re-evaluation in September 2018, and the District implemented the evaluation plan. Ex. D362.

On appeal, Plaintiff asserts that the District failed to evaluate Student under the category of ED after Parent notified the District that Student attempted suicide in November 2017 and

requested evaluations of Student's mental health, social skills, ADHD, and potential Autism

Spectrum Traits. Pl.'s Br. 16-17, ECF No. 21 (citing Ex. S64, 1). The November 2017 IEP

Meeting minutes and Parent's follow-up email the next day documented Parent's report of

Student's suicide attempt. Ex. S64, 1. However, while Parent participated in the November 2017

IEP Meeting, the record does not indicate that Parent requested Student be evaluated under the

category of ED at the time. Two months later when Parent requested the new SDI categories of

Alternatives to Conflict and Dealing with Feelings/Self-awareness, it was not a request for

evaluation of Student under the category of ED. Regardless, based on Student's behavior and

performance at school, the District staff believed that the requested measures were appropriate

for students with more significant deficits than Student. Tr. Vol. V 935:3-936:18; Ex. D246, 3-4;

*see* Tr. Vol. VI 1135:4-1137:15.

As to Parent's April 2018 request for evaluation of Student's mental health, social skills,

ADHD and potential Autism Spectrum Traits, Parent also did not request evaluation under the

category of ED. Ex. D291, 1. As noted in the Final Order and based on the evidence in the

record, Parent's first request for an evaluation for any additional suspected disabilities under the

category of ED came in May 2018[3]. Ex. D343, 2-3. The record also reflects that, at that time, the

District agreed to evaluate Student under the category of ED, including all necessary assessments

and records reviews. Ex. D341, 26-27, Ex. D361, 1-2. However, Parent inexplicably elected to

withhold consent for the requested evaluation until September 2018 despite the District's

willingness to conduct evaluations over the summer while Student was participating in

educational activities at a District building. Ex. D341, 26-27, Ex. D361, 1-2; Ex. D359. Upon

---

[3] The Final Order states that Parent's first request of evaluation under the category of ED came in June 2018. Compl., Ex. 1, Final Order, 74, ECF No. 1-1.

receiving Parent's consent, the District implemented the evaluation plan within 60 days. Ex.

D362.

The ALJ found:

A review of the relevant IEPs reflects the District's efforts to obtain, consider, and include information pertaining to Student's mental health concerns obtained from Dr. Murray, Student's treating psychologist, Parent, and Mrs. Dayton, Student's behavior support specialist. In addition, beginning in late 2018 the District also began incorporating information provided by the Parent's legal counsel.

Compl., Ex. 1, Final Order 78, ECF No. 1-1.

In light of the record, this Court finds Plaintiff's assertion that the District failed to

evaluate Student in November 2017 and April 2018 unavailing.

Plaintiff's appeal does not explicitly challenge the District's Form 220B evaluation by

Ms. Taubenfeld's document review. *See* Pl.'s Br. 18, ECF No. 21. To the extend Plaintiff

challenges the Form 220B, this Court adopts the Final Order's analysis on the issue of the Form

220B evaluation:

[W]ith respect to the District's Form 220B evaluation report prepared in January 2018 in preparation for Student's triannual reevaluation, the record is devoid of any request by Parent prior to that date for additional assessments or evaluation. Further, the District's [F]orm 220B was prepared in advance of Student's reevaluation and prior to parental consent for that reevaluation. [Because] Parent consented to a summary reevaluation process consisting of a review of existing records, the District's Form 220B evaluation report would have been sufficient to satisfy the requirements of the IDEA.

For these reasons, this Court finds that the ALJ did not err in concluding that the District

evaluated Student in all suspected areas of disability in a timely manner.

*iii. Dr. Panaccione's Testimony*

Plaintiff contends that the ALJ abused his discretion in according no weight to Dr.

Panaccione's testimony because the Final Order contains no reference of Dr. Panaccione's

testimony. Pl.'s Br. 19, ECF No. 21.

Dr. Panaccione testified about Student's condition. Evidence concerning Student's condition in the record is abundant, including Student's private psychologist, Dr. Murray's testimony and documentation. Therefore, the ALJ is not required to explain why he did not include Dr. Panaccione's testimony or to explain why he chose to accord no weight to Dr. Panaccione's testimony. This Court finds that the ALJ did not err in not referencing Dr. Panaccione's testimony.

2. Conclusion 2. The District did not refuse to approve an IEE [Independent Educational Evaluation] for Student.

As an initial matter, Plaintiff claims that there is an error of fact in the ALJ's finding that "Parent's earliest request for an IEE came on or about February 5, 2018, while Student's IEP team were preparing for his/her triannual re-evaluation." Pl.'s Br. 20, ECF No. 21. Plaintiff asserts that "Parent's request for an IEE came mere weeks following her receipt of District's 'evaluation' based on a review of records and summarized on Form 220B." *Id.*

According to Ms. Taubenfeld's email to Parent on February 2, 2018, Ms. Taubenfeld sent the Form 220B evaluation to Parent in that email. Ex D267, 2-3. Plaintiff does not cite any evidence in the record that indicates an earlier date. *See* Pl.'s Br. 20, ECF No. 21. Instead, Plaintiff states that "On February 15, 2018, after District 'evaluated' [S]tudent by conducting a records review (summarized in Form 220B), Parent requested an Independent Education Evaluation." *Id.* at 21 (citing Ex. S13). While the ALJ's reference of February 5, 2018 is three days off, the difference is insignificant to disturb the ALJ's analysis.

Plaintiff next contends that the District neither granted Parent's IEE request on public funds nor filed a request for due process hearing pursuant to OAR 581-015-2305(4). Pl.s Br. 21, ECF No. 21. The ALJ addressed this issue in the Final Order:

At that time [when Parent made the IEE request in February 2018], the team was reviewing records and collecting data in preparation for any additional evaluations Student might need. Importantly, parent's request for an IEE occurred approximately three years after the last evaluation. During that time, the record does not reflect any disagreement by [P]arent with the initial evaluation. Rather, [P]arent's request in February 2018 appeared designed to preempt the District's re-evaluation of Student. An IEE request in anticipation of an evaluation is premature. Where, as here, a [P]arent requests an IEE more than two years after the initial evaluation, permitting the IEE would allow parent to circumvent the two-year statute of limitations. *Student v. Atlanta Public Schools* 51 IDELR 29 (GA SEA 2008)[] (finding that a student's request for an IEE made three years after the district conducted its assessment, was "untimely, as it was not made within a reasonable time after [the district] conducted its evaluation and is beyond the two-year statute of limitations.")

Compl., Ex. 1, Final Order 87, ECF No. 1-1.

Additionally, "because Student's re-evaluation had not yet occurred and Parent had not given consent for the re-evaluation, Parent's request for an IEE appears premature because an evaluation with which the Parent might disagree had not yet occurred. *See* OAR 581-015-2305 (1)." *Id.* The ALJ continued:

At the time of Parent's February 2018 IEE request, the District attempted to ascertain the basis for Parent's request and determine whether Parent was seeking additional evaluations for Student's current eligibility category of OHI and or a different eligibility category. During those conversations, the District asserted its position that there was no current evaluation with which the Parent disagreed to form the basis for her IEE request. As an alternative, the District repeatedly offered to conduct any additional evaluations Parent deemed necessary. Further, the District pointed out Parent was not precluded from obtaining an IEE prior to the re-evaluation only asserted non-responsibility for payment on the part of the District if such an evaluation preceded the District's re-evaluation of Student.

With regard to Parent's specific requests for an "IEE" from Educational Connections, the evidence reflects that Parent was not seeking an educational evaluation but rather an evaluation to determine an appropriate placement for Student, specifically an appropriate residential placement. Reading the evaluation requirements in the context of the statute and rules in which they appear, it is clear the purpose of such evaluations is to ascertain a student's at disabling conditions, if any, and to determine a student's potential eligibility categories for special education services. That does not appear to be the purpose of parent's requested evaluation by Educational Connections.

> In addition, as Student's emotional instability continued to escalate during 2018, Parent shifted focus from the IEE to an evaluation under the eligibility category of ED and securing a therapeutic residential placement for Student. There is no evidence in the record indicating that Parent requested an IEE from the District after the District's November 2018 evaluation of Student.

*Id.* at 87-88. Based on these findings and analysis, the ALJ concluded that the District did not deny any valid request by Parent for an IEE. *Id.* at 88.

On review of the record, this Court finds the ALJ's findings and discussions thorough and careful. This Court will not disturb the ALJ's Conclusion 2.

3. Conclusion 3. The District developed an Individualized Education Plan (IEP) that was appropriately ambitious and reasonably calculated to enable Student to receive educational benefits in light of his/her unique needs and circumstances.

Plaintiff challenges Conclusion 3 based on two assertions. First, the District failed to collect and report progress data, Student's progress reports contained no or little data and were often illegible, and Student's progress reports were at times the exact copy of the prior progress report. Pl.'s Br. 21, ECF No. 21. This Court finds that nothing in the record substantiates Plaintiff's assertion.

Second, Plaintiff asserts that the District failed to create an appropriate safety plan stating that "Dr. Panaccione testified at length to the inadequacy of the District's safety plans for a child with suicide ideation." Pl. Br. 21, ECF No. 21. As Defendant counters, Plaintiff mischaracterizes Dr. Panaccione's testimony. Def.'s Br. 9, ECF No. 22. Dr. Panaccione did not testify that the District's safety plan was inadequate. Tr. Vol. IV 740:7-747:7. Rather, Dr. Panaccione testified about the general components of a safety plan and what kind of safety plan she would hypothetically create for Student. *Id.*

This Court finds that the ALJ made thorough and careful findings in concluding that the District developed an IEP that was appropriately ambitious and reasonably calculated to enable Student to receive educational benefits in light of his/her unique needs and circumstances.

4. Conclusion 4. The District provided education to Student in the least restrictive environment appropriate for Student's needs.

As argued during the due process hearing, Plaintiff contends that the District failed to place Student in the least restrictive environment because the Ninth Circuit has determined that "mainstreaming" is the least restrictive environment, and is the placement preferred by Congress when it passed the IDEA. Pl.'s Br. 24, ECF No. 21; *see* Compl., Ex. 1, Final Order, 82, ECF No. 1-1.

The IDEA provides:

To the *maximum extent possible* [school districts should ensure that] children with disabilities, including children in public or private institutions or other care facilities, are educated with children who have no disability, and special classes, separate schooling, or *other removal of children with disabilities from the regular educational environment occurs only if the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.*

20 U.S.C. 1415(5)(a) (emphasis added); *see also*, OAR 581-015-2240(1). As the ALJ noted,

Parent's argument demonstrates a fundamental misunderstanding of the LRE [Least Restrictive Environment] requirements. As identified above, the IDEA requires, to the maximum extent appropriate, children with disabilities are educated with children who do not have a disability. OAR 581-015-2240(1). While Student's current educational placement offers limited access to nondisabled peers, through online interaction, that placement also contemplates a step-up plan designed to reintegrate Student into the public school environment with nondisabled peers when he/she is deemed ready. By contrast, parent's proposed residential placement in a therapeutic environment would limit Student's access to only similarly disabled students and deprive him/her of any interaction with nondisabled peers.

Compl., Ex. 1, Final Order 82, ECF No. 1-1.

In drawing Conclusion 4, the ALJ also explained:

23 – OPINION AND ORDER

According to Dr. Murray, there is no public school environment where Student can safely access his/her general education curriculum and SDI. Rather, Dr. Murray believes that either the current online/tutoring placement or a residential facility are the only environments where Student can safely access his/her educational curriculum and SDI. At the time of hearing, the record reflects that in his/her current educational placement Student is on track to graduate with a regular high school diploma and is receiving SDI and related services from District staff, at least up to the point where parent requested termination of skills training by District staff.

*Id.* at 82.

Additionally,

Nothing in the record demonstrates that Student cannot receive a FAPE from the District. To the contrary, in the current online/tutoring environment, Student has access to the general education curriculum along with interaction with his/her nondisabled peers, albeit in a less than real-time environment. In addition, the District has offered and is capable of providing Student's SDI and related services for all of the goals contained in Student's IEP.

*Id.* at 83.

This Court finds that the record supports the ALJ's thorough and careful analysis that led to the conclusion that Student's placement in online tutoring was the least restrictive environment based on Student's condition.

5. Conclusion 5. The District provided specially designed instruction and related services reasonably calculated to confer meaningful benefit to Student during the period in issue.

Plaintiff argues that the "District did not provide mental health related services." Pl.'s Br. 25, ECF No. 21. The ALJ made the following findings:

A review of the record demonstrates that, while Student was engaged in the District online program with tutoring (in either eighth or eleventh/twelfth grades), Student received SDI and related services (accommodations) directly from his/her tutor and special education teacher. In addition, while Student was enrolled and attending classes on the [school] campus, his/her SDI and related services were provided by multiple individuals across environments including special education and general education classes. Based on the evidence in the record, the greatest impediment to Student receiving SDI and related services were a lack of attendance based, at least in part, on Parent's refusal to send Student to school. In

addition, as of November 2018 Parent formally requested that the District stopp [sic] providing SDI with regard to Student's Social/Emotional/ Behavioral AGs [annual goals] and STOs [short term objectives].

There is insufficient evidence in the record to demonstrate that the District failed or refused to provide student's SDI and related services as outlined in his/her IEPs.

Compl., Ex. 1, Final Order 83, ECF No. 1-1.

During the 2016-2017 school year, Student regularly missed Fridays on campus due to outside therapy appointments. Tr. Vol. V 915:23-917:11. Nevertheless, in the tenth grade, Student was progressing well, had improved attendance, and was earning more credits toward graduation than the previous school year. *Id.* In the eleventh grade, Student missed approximately 14 percent of the 2017-2018 school year during the first semester. Ex. D271; Tr. Vol. VI 1187:15-1188:3. In one incident, Student missed school because the family had been out late the previous night and did not notify the school. Ex. D218, 2-3. Ms. Fee testified that she noticed Student had significantly increased absences in the second semester. Tr. Vol. VI 1102:1-21. At the May 2018 IEP Meeting, Ms. Fee was surprised by Parent's choice to keep Student out of school: "That's not something that I had heard before as a consideration for the Student. The regular education teacher's report is pretty consistent with … what we saw at school as far as regular education in class participation and performance when [Student] was there." Tr. Vol. VI 1135:4-22; *see also*, Tr. Vol. VI 1136:2-24; Ex. D343, 1-3. Student's other teachers stated that Student did good work and earned high grades when in class but Student's overall grade was low due to poor attendance and missed tests and assignments. Ex. D343, 1.

On review of the record, this Court finds that the ALJ's findings are supported by the evidence in the record and did not err in finding that the District provided specially designed instruction and related services reasonably calculated to confer meaningful benefit to Student.

<u>6. Conclusion 6. The District provided adequate prior written notice of its decision regarding an IEE for Student.</u>

A school district must provide prior written notice (PWN) to the parents of a child whenever the school district proposes to initiate or change, or refuses to initiate or change, the identification, evaluation, or educational placement of the child, or the provision of a FAPE to the child. 20 U.S.C. §1415(b)(3); 34 C.F.R. §300.503(a), OAR 581-015-2310. The procedures relating to PWN are designed to ensure that the parents of a child with a disability are both notified of decisions affecting their child and given an opportunity to object to those decisions. *C.H. v. Cape Henlopen Sch. Dist.*, 606 F.3d 59, 70 (3rd Cir. 2010). At the due process hearing, Parent contended that the District failed to provide PWN when it refused to approve and fund an IEE for Student and when it refused to approve Student's placement in a therapeutic residential facility. Compl., Ex. 1, Final Order 85, ECF No. 1-1.

As discussed above, the ALJ found that the District did not deny any valid request by Parent for an IEE. *Supra*, Discussion III.B.2. Accordingly, this Court finds that the ALJ did not err in concluding that the District was not required to issue a prior written notice regarding Parent's request for an IEE. Compl., Ex. 1, 88, ECF No. 1-1.

As to Plaintiff's assertion that the District failed to provide a prior written notice when it refused to approve Student's placement in a therapeutic residential facility, the ALJ provided the following thorough and careful discussion:

> On November 5, 2018, Student's IEP team, including [P]arent and her legal counsel, attended a lengthy meeting addressing Student's IEP, eligibility determination, and placement. At that meeting, Parent disagreed with the District's selected placement invoiced [sic] several reasons for her disagreement. Despite this disagreement, the majority of the IEP team decided the appropriate placement for Student was in the SPS [the District] online environment with tutoring. At that time, the team rejected Parent's proposed residential placement as well as other placement options. Those decisions are memorialized in two

documents, the District's Special Education Placement Determination and the District's Prior Written Notice dated November 5, 2018.

The District's placement determination contains a description of for [sic] placement options considered by the team including Parent's proposed residential placement. Each placement option is summarized in the benefits and possible harmful effects of each option are addressed. Each option contains a description of modifications and supplementary aids and services necessary for the placement. Finally, for each placement option considered, the District included a rationale for its selection or rejection of that option.

The District PWN contains a description of the placement proposed by the District. The PWN also includes a summary of the evaluations, assessment, and records used as a basis for the District's decision. Further, the PW when contains a description of other options considered along with the rationale for rejecting such options. Included within that section is [P]arent's request for a residential placement. In addition, the district PWN indicates [P]arent was provided with procedural safeguards related to this decision. Parent does not dispute this.

The District provided Parent with a copy of its placement determination and PWN at the November 5, 2018[] meeting. A review of the District's PWN reveals that it includes all the necessary requirements contained in OAR 581-015-2310(3). Further, the District provided additional information, regarding its rationale for rejecting residential placement, to Parent in its placement determination. Therefore, the District satisfied both the letter and spirit of the law when it provided this information to Parent regarding its rejection of the proposed residential placement. *C.H.*, 606 F.3d 70.

Compl., Ex. 1, Final Order 88, ECF No. 1-1.

This Court finds that the evidence in the record supports the ALJ's analysis. In view of the ALJ's thorough and careful analysis, this Court gives deference to the ALJ's Conclusion 6.

7. Conclusions 7-9. Student failed to demonstrate the District discriminated against him/her in the evaluation of his/her mental health condition, by failing to provide educational aids and services to allow Student to access in a full day of school, and by declining to provide residential placement to address Student's mental health needs.

In the due process complaint, Parent asserted these § 504 claims: the District is responsible for intentional discrimination against Student based on the alleged failure to evaluate, failure to provide necessary aids and service, and refusal to place Student in an appropriate residential facility. Compl., Ex. 1, Final Order 89, ECF No. 1-1. Parent

27 – OPINION AND ORDER

acknowledged that the § 504 claims are "rooted in the same facts and events" giving rise to the

IDEA claims. Student's Closing Br., 64.

 The ALJ dismissed the § 504 claims based on the following discussion:

> 34 CFR §104.36 provides that compliance with the procedures in the IDEA
> satisfies the requirements of §504. See, *Pasatiempo by Pasatiempo v. Aizawa*, 103
> F.3d 796, 798 (9th Cir. 1996.) Because this order determined that the District
> complied with the requirements of the IDEA, and because Parent asserts that the
> §504 claims raised in the due process complaint derive from the same alleged
> failures by the District, Parent's discrimination claims under §504 must fail.
> Further, because Parent failed to demonstrate Student was denied an opportunity
> to participate in or benefit from the aid, benefit, or service that is equal to that
> afforded to others, there is no basis for finding discrimination on the part of the
> District. See, 34 CFR §104.4(b). Accordingly, Parent's claims for relief under
> §504 are dismissed.

Compl., Ex. 1, Final Order 89, ECF No. 1-1.

 As found above, the ALJ did not err in finding that the District complied with the

requirements of the IDEA. *Supra*, Discussion III.B.1-6. Accordingly, the ALJ did not err in

finding that Student failed to demonstrate that the District discriminated against Student. *See*

*Pasatiempo by Pasatiempo*, 103 F.3d at 798 ("Regulations promulgated under § 504 … provide

that compliance with the IDEA's procedures satisfies the requirements of § 504.").

 <u>10. Conclusion 10. Student failed to show he/she is entitled to the remedies requested in
his/her due process complaint.</u>

 An ALJ has broad equitable powers in special education cases to remedy the failure of a

school district's failure to provide FAPE to a disabled child. *Forest Grove School Dist. v. T.A.*,

557 U.S. 230 (2009). In determining the equitable remedy, the ALJ may consider the school

district's failure to update student's IEP, placements, and other documents, and their refusal to

cooperate. *See Anchorage Sch. Dist. v. M.P.*, 689 F.3d 1047, 1059-1060 (9th Cir. 2012).

 Here, the ALJ found that Plaintiff failed to present evidence sufficient to prevail on any

of the claims raised either under the IDEA or § 504. After careful review of the record and the

ALJ's reasoning, this Court agrees with the ALJ's conclusions. As such, there is no basis to award Plaintiff's requested remedies. This Court finds that the ALJ did not err in declining to award the relief sought by Plaintiff.

## CONCLUSION

The Court affirms the ALJ's Final Order.

DATED this <u>23rd</u> day of September 2020.

<u>s/ Mustafa T. Kasubhai</u>
MUSTAFA T. KASUBHAI
United States Magistrate Judge